LAWYERS FOR CLEAN WATER, INC.
Caroline Koch (Bar No. 266068)
    Email:  caroline@lawyersforcleanwater.com
Daniel Cooper (Bar No. 153576)
    Email: daniel@lawyersforcleanwater.com
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone:  (415) 440-6520
Facsimile:  (415) 440-4155

SAN FRANCISCO BAYKEEPER
Erica A. Maharg (Bar No. 279396)
    Email: erica@baykeeper.org
Nicole C. Sasaki (Bar No. 298736)
    Email: nicole@baykeeper.org
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160

*Attorneys for Plaintiff*
SAN FRANCISCO BAYKEEPER

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a California non-profit corporation;<br><br>               Plaintiff,<br>   v.<br><br>DARLING INGREDIENTS, INC., a Delaware Corporation;<br><br>              Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

San Francisco Baykeeper ("Baykeeper" or "Plaintiff"), by and through counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.   On February 24, 2017, Baykeeper issued a 60-day notice letter ("Notice Letter") to Darling Ingredients, Inc. ("Darling" or "Defendant"), which is attached hereto as Exhibit A and incorporated by reference herein. The Notice Letter informed Darling of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) (hereinafter "Storm Water Permit"), of San Francisco Municipal Code, Public Works Code, Article 4.1 ("Pretreatment Ordinance"), Permit No. 10-06513 Industrial User Class I Wastewater Permit, Permit No. 13-06983 Industrial User Class I Wastewater Permit, and Permit No. 16-06568 Industrial User Class I Wastewater Permit (collectively referred to as "the Pretreatment Permits"), and the Clean Water Act at its industrial facility located at 429 Amador Street, San Francisco, California 94124 ("Facility"). The Notice Letter also informed Darling of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit, the Pretreatment Ordinance, the Pretreatment Permits, and the Clean Water Act.

3.   The Notice Letter was sent to the registered agent for Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"), the General Manager of the San Francisco Public Utilities Commission ("PUC"), the San Francisco City Attorney, and the San Francisco District Attorney, as required by 40 C.F.R. § 135.2(a)(1), Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and/or the Pretreatment Ordinance.

4.   More than sixty (60) days have passed since the Notice Letter was served on Defendant

and the State, Federal, and local agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, the State of California, nor the City of San Francisco has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Intradistrict assignment of this matter to the San Francisco Division of the Court is appropriate pursuant to Civil Local Rule 3-2(d). The events or omissions which give rise to Baykeeper's claims occurred in the County of San Francisco, which is under the jurisdiction of the San Francisco Division of the Northern District of California.

7.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit, the Pretreatment Ordinance, the Pretreatment Permits, and the Clean Water Act resulting from industrial activities at the Facility.

## II.      PARTIES

### A.     San Francisco Baykeeper.

8.     Plaintiff San Francisco Baykeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Oakland, California. Baykeeper's mission is to protect and enhance the water quality and natural resources of San Francisco Bay, its tributaries, and other waters in the Bay Area, for the benefit of its ecosystems and communities. Baykeeper's approximately 1,500 members live and/or recreate in and around the San Francisco Bay area. Baykeeper is dedicated to protecting the water quality of San Francisco Bay for the benefit of its ecosystems and communities. To further these goals, Baykeeper actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.     Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near and recreate in San Francisco Bay and its tributaries, including San Francisco Bay, into which Defendant discharges pollutants. Baykeeper members use and enjoy San Francisco Bay and its

tributaries for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Defendant's discharges of storm water containing pollutants impair each of these uses. Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA, the Storm Water Permit, the Pretreatment Ordinance, and the Pretreatment Permits.

**B.    The Owner and/or Operator(s) of the Facility.**

10.    Plaintiff is informed and believes, and thereon alleges, that Darling Ingredients, Inc. is the owner of the Facility.

11.    Plaintiff is informed and believes, and thereon alleges, that Darling Ingredients, Inc. is the operator of the Facility.

12.    Plaintiff is informed and believes, and thereon alleges, that Darling Ingredients, Inc. is an active Delaware Corporation registered to do business in California.

13.    Plaintiff refers to Darling Ingredients, Inc. herein as the "Facility Owner and/or Operator."

14.    Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Darling Ingredients, Inc. is C T Corporation System 818 W. 7th Street, Suite 930 Los Angeles, California 90017.

**III.    LEGAL BACKGROUND**

**A.    Clean Water Act Regulation of Storm Water Associated with Industrial Activities.**

15.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

16.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

17.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

18.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial

1    storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

2       19.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-

3 approved NPDES permit program for regulating the discharge of pollutants, including discharges of

4 polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are

5 authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES

6 permits issued to dischargers and/or through the issuance of a statewide general NPDES permit

7 applicable to all industrial storm water dischargers. *See id.*

8       20.    Storm water runoff is one of the most significant sources of water pollution in the nation

9 and has been recognized as a leading cause of significant and cumulative harmful impacts to the water

10 quality of San Francisco Bay. With every significant rainfall event, hundreds of millions of gallons of

11 polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains,

12 local tributaries, and San Francisco Bay. The consensus among state and federal agencies and water

13 quality specialists is that storm water pollution accounts for more than half of the total pollution entering

14 the San Francisco Bay watershed each year.

15       **B.    California's Storm Water Permit.**

16       21.    California is a state authorized by EPA to issue NPDES permits.

17       22.    In California, the State Board is charged with regulating pollutants to protect California's

18 water resources. *See* Cal. Water Code § 13001.

19       23.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board

20 pursuant to the Clean Water Act.

21       24.    Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-

22 DWQ, which Plaintiff refers to as the "1997 Permit."

23       25.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ, the Storm Water Permit was

24 reissued, which Plaintiff refers to as the "2015 Permit."

25       26.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its

26 terms are as stringent, or more stringent, than the terms of the 1997 Permit. See 2015 Permit, Finding 6.

27       27.    In order to discharge storm water lawfully in California, industrial dischargers must

28 secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an

individual NPDES permit. 1997 Permit, Finding #2; 2015 Permit, Finding 12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Finding #3; *see also* 2015 Permit, Finding 17.

28.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 1997 Permit, Section C(1) (Standard Provisions); *see also* 2015 Permit, Section XXI(A) (Duty to Comply).

29.     Defendant submitted a Notice of Intent to comply with the 1997 Permit to the State Board on or around May 21, 1997.

30.     Defendant submitted a Notice of Intent to comply with the 2015 Permit to the State Board on or around June 9, 2015.

**C.      The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

31.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* 1997 Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III(B).

32.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section V(A).

33.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation

V(A).

34.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

35.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

36.     According to EPA's Industrial Stormwater Fact Sheet for Section U, Food and Kindred Products Facilities, polluted discharges from rendering plants such as the Facility contain BOD, TSS, oil and grease ("O&G"), pH, and nitrogen nitrate + nitrite ("N+N").

37.     The EPA Benchmarks for the following parameters are as follows: BOD, 30 mg/L; chemical oxygen demand ("COD"), 120 mg/L; pH, $6.0 - 9.0$ standard units ("SU"); TSS, 100 mg/L; iron, 1.0 mg/L; N+N, 0.68 mg/L; O&G, 15 mg/L; and aluminum, 0.75 mg/L. Additional EPA Benchmarks for heavy metals as follows also apply to storm water discharges from the Facility: copper, 0.0048 mg/L; and zinc, 0.09 mg/L.

38.     Storm water runoff from industrial sites such as the Facility causes harm to humans and aquatic life. In particular, storm water can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate and nitrite. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

39.     High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS have been shown to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated

with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

40. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility.

41. The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 1997 Permit, Receiving Water Limitation C(1); *see also* 2015 Permit, Section VI(B).

42. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the 1997 Permit and Section VI(B) of the 2015 Permit.

43. The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 1997 Permit, Receiving Water Limitation C(2); *see also* 2015 Permit, Receiving Water Limitation VI(A).

44. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

45. The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

46. The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the WQS and beneficial uses for San Francisco Bay and its tributaries.

47. The Beneficial Uses for San Francisco Bay are: industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water,

recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

48.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

49.     According to the 2012 303(d) List of Impaired Water Bodies, Islais Creek is impaired for ammonia, chlordane, dieldrin, hydrogen sulfide, PAHs, and sediment toxicity.

50.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

51.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

52.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

53.     The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

54.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.

55.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://nepis.epa.gov/Exe/ZyPDF.cgi/P1007BKN.PDF?Dockey=P1007BKN.PDF.

56.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

///

///

Complaint                                    8

**D.**     **The Storm Water Permit Storm Water Pollution Prevention Plan Requirements.**

57.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

58.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

59.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from an industrial Facility. 1997 Permit, Section A(2); 2015 Permit, Section X.

60.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

61.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. 1997 Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

62.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.      The Storm Water Permit Monitoring and Reporting Requirements.**

63.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit requires implementation of an M&RP. 2015 Permit, Sections X(I) and XI.

64.     The M&RP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *See* 1997 Permit, Section B(2). The M&RP must ensure that practices at the facility to prevent or

reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

65.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the 2015 Permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

66.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Sections X(I) and XI.

67.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

68.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

69.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3).

70.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

71.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

72.     Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other

storm event during the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events during the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

73.     Section B(15) of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit, Sections B(5), B(7), and B(15).

74.     Section XI(B)(2) of the 2015 Permit requires dischargers not participating in a compliance group to collect and analyze storm water samples from two (2) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31) and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

75.     The Facility was part of the Port of San Francisco and Tenants group monitoring program, and thus the Facility Owner and/or Operator was required to comply with the group monitoring provisions set forth in Section B(15) of the 1997 Permit

76.     The Facility is no longer part of a group monitoring program and must comply with the individual sampling requirements of Section XI(B)(2) of the 2015 Permit.

77.     Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

78.     Section XI(B)(1) of the 2015 Permit requires sampling during QSEs, defined as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

79.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

80.     Section B(5)(c)(i) of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger was permitted to

1  substitute analysis for O&G instead of TOC.

2      81.    Section B(5)(c)(ii) of the 1997 Permit required dischargers to analyze each sample for

3  toxic chemicals and other pollutants likely to be present in significant quantities in the storm water

4  discharged from the facility.

5      82.    Section B(5)(c)(iii) and Table D of the 1997 Permit and Table 1 of the 2015 Permit

6  require Facility classified as Standard Industrial Classification ("SIC") code 207X (Fats and Oils) such

7  as the Facility, to also analyze storm water samples for BOD, COD and N+N, as well as other

8  parameters required by the Regional Board.

9      83.    Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for

10  TSS, O&G, and pH.

11      84.    Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for

12  pollutants associated with industrial operations.

13      85.    Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water

14  samples for additional applicable industrial parameters related to receiving waters with 303(d) listed

15  impairments, or approved Total Maximum Daily Loads.

16      86.    Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to

17  the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of

18  visual observations and sampling results, an evaluation of the visual observations and sampling and

19  analysis results, laboratory reports, the annual comprehensive site compliance evaluation report

20  specified in Section A(9), an explanation of why a facility did not implement any activities required, and

21  the records specified in Section B(13)(i).

22      87.    Section XVI of the 2015 Permit requires dischargers to submit an Annual Report with a

23  Compliance Checklist that indicates whether a discharger complies with, and has addressed all

24  applicable requirements of the 2015 Permit, an explanation for any non-compliance of requirements

25  within the reporting year, as indicated in the Compliance Checklist, an identification, including page

26  numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s)

27  of the Annual Evaluation.

28  ///

**F.      The 2015 Permit Exceedance Response Actions Requirements.**

88.      When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." *See* 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a Numeric Action Level ("NAL") exceedance for that same parameter. *See* 2015 Permit, Section XII(C).

89.      Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* 2015 Permit, Section XII(C)(1)(a)-(c).

90.      Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section XII(C)(1)(c).

91.      Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii).

92.      The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(iii).

93.      A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

1        **C.      The Pretreatment Ordinance.**

2        94.      Indirect dischargers are those dischargers whose wastewater passes through publicly

3    owned treatment works ("POTWs"). *See Nat'l Assoc. of Metal Finishers v. EPA*, 719 F.2d 624, 633 (3d

4    Cir. 1983).

5        95.      Congress regulated these dischargers in recognition that "the pollutants which some

6    indirect dischargers release into POTWs could interfere with the operation of the POTWs, or could pass

7    through the POTWs without adequate treatment." *Nat'l Assoc. of Metal Finishers*, 719 F.2d at 633.

8        96.      Indirect dischargers are required to comply with pretreatment standards promulgated by

9    EPA under section 307 of the Clean Water Act and pretreatment standards promulgated by local

10   POTWs. *Chem. Mfrs. Assoc. v. Natural Res. Def. Council*, 470 U.S. 116, 119 (1985); 40 C.F.R. § 403.8.

11       97.      CWA section 307(d), 33 U.S.C. § 1317(d), prohibits the operation of facilities subject to

12   pretreatment effluent limitations in violation of those standards.

13       98.      Pretreatment standards are meant to "prevent the discharge of any pollutant through [the

14   POTW], which pollutant interferes with, passes through or otherwise is incompatible with such works,"

15   and are enforceable effluent limitations. 33 U.S.C. § 1317(b)(1); *Sierra Club v. Union Oil Co.*, 813 F.2d

16   1480, 1482 (9th Cir. 1987).

17       99.      Pretreatment standards establish numeric limits on discharges by specific categories of

18   industrial sources. *Nat'l Assoc. of Metal Finishers*, 719 F.2d at 634; 40 C.F.R. § 403.6.

19       100.     The Pretreatment Ordinance establishes the PUC's pretreatment program, including

20   permit application requirements, permit requirements, local limits and prohibitions for pollutant

21   discharges into its POTW, and monitoring and reporting requirements, as required by the Clean Water

22   Act. 40 C.F.R. § 403.8; *Pub. Interest Research Group v. Ferro Merch. Equip. Corp.*, 1988 U.S. Dist.

23   LEXIS 17413, at *5-6 (D.N.J. Nov. 15, 1988) ("Pursuant to the federal regulations, POTW's can

24   establish their own local limits for pollutant discharges which replace the federal standards as long as

25   they are more stringent 40 C.F.R. § 403.4."); *see also* Pretreatment Ordinance §§ 118, 123, 124, 125,

26   127.

27       101.     Indirect dischargers such as Darling are required to comply with the terms of the

28   Pretreatment Ordinance. 40 C.F.R. § 403.4; *Ferro Merch. Equip. Corp.*, 1988 U.S. Dist. LEXIS 17413,

Complaint                                     15

at *5; *Inland Empire Waterkeeper v. Uniweb, Inc.*, 2008 U.S. Dist. LEXIS 75585, at *4-5 (C.D. Cal. Aug. 6, 2008).

102.    Based on EPA's Report to Congress: Implementation and Enforcement of the Combined Sewer Overflow Control Policy, polluted storm water and commingled wastewater discharged into San Francisco's combined sewer system from industrial facilities such as Defendant's can, and does, discharge directly into surface waters as combined sewer overflows ("CSOs"). CSOs are untreated, or only partially treated, discharges of human waste and pollutants discharged by commercial and industrial establishments, and are major sources of water pollution. Discharges of CSOs into San Francisco Bay and its tributaries are known to cause adverse human health effects (e.g., gastrointestinal illness), beach closures, shellfish bed closures, toxicity for aquatic life, and aesthetic impairment. Organic compounds, metals, oil, grease, and toxic pollutants, among other pollutants of concern, contained in CSOs harm aquatic life, have adverse public health effects, and cause fishing and shellfishing restrictions. BOD in CSOs results in reduced oxygen levels and fish kills. As part of San Francisco's combined sewer system, there are several outfalls designed to discharge CSOs into Islais Creek, which is part of the system's "Central Basin."

**D.    The Pretreatment Permits.**

103.    In San Francisco, any person who discharges wastewater into the POTW must comply with the Pretreatment Ordinance and a pretreatment permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1317; 40 C.F.R. § 403.8; *see also* Pretreatment Ordinance §§ 118, 123, 124, 125, 127.

104.    Indirect discharger pretreatment permits establish effluent limits, as well as self-monitoring, sampling, reporting, notification, and recordkeeping requirements. *Id.* (citing 40 C.F.R. § 403.8(f)(1)).

105.    Indirect dischargers must monitor and report the concentration of each discharged regulated pollutant. *Int'l Union v. Amerace Corp.*, 740 F. Supp. 1072, 1079 (D.N.J. 1990) (citing 40 C.F.R. § 403.12(e)(1)).

106.    Pursuant to the Pretreatment Ordinance, Darling obtained permits to discharge industrial wastewater and storm water into the POTW in 2010, 2013, and 2016.

107.     Between June 17, 2010, and June 17, 2013, the Pretreatment Permit in effect for the Facility was Permit No. 10-06513, which Baykeeper refers to as the "2010 Permit."

108.     Between June 17, 2013, and June 16, 2016, the Pretreatment Permit in effect for the Facility was Permit No. 13-06983, which Baykeeper refers to as the "2013 Permit."

109.     Between June 17, 2016, and June 16, 2019, the Pretreatment Permit in effect for the Facility is Permit No. 16-06568, which Baykeeper refers to as the "2016 Permit."

110.     On April 21, 2017, the 2016 Permit was amended, which Baykeeper refers to as the "Amended 2016 Permit."

111.     Plaintiff is informed and believes, and thereon alleges, that Defendant submitted an application in support of the 2010 Permit, which is dated May 24, 2010.

112.     Plaintiff is informed and believes, and thereon alleges, that Defendant's application submitted in support of the 2010 Permit does not include information required by the Pretreatment Ordinance, including but not limited to information indicating that the Facility is regulated by the Storm Water Permit.

113.     Plaintiff is informed and believes, and thereon alleges, that Defendant submitted an application in support of the 2013 Permit, which is dated May 24, 2010.

114.     Plaintiff is informed and believes, and thereon alleges, that Defendant's application submitted in support of the 2013 Permit does not include information required by the Pretreatment Ordinance, including but not limited to information indicating that the Facility is regulated by the Storm Water Permit and a current certification.

115.      Plaintiff is informed and believes, and thereon alleges, that Defendant submitted an application in support of the 2016 Permit, which is dated April 8, 2016.

116.     Plaintiff is informed and believes, and thereon alleges, that Defendant's application submitted in support of the 2016 Permit, does not include information required by the Pretreatment Ordinance, including but not limited to information indicating that the Facility is regulated by the Storm Water Permit, information describing proposed wastewater and/or sludge treatment processes, and information adequately identifying the chemicals contained in wastewater discharges from the Facility.

117.     Plaintiff is informed and believes, and thereon alleges, that Defendant did not submit an

application in support of the Amended 2016 Permit.

118.    Baykeeper refers to the 2010 Permit, the 2013 Permit, the 2016 Permit, and the Amended 2016 Permit collectively as the "Pretreatment Permits."

119.    Though the 2010 Permit and the 2013 Permit have expired, and though the 2016 Permit was amended, Darling is liable for violations of those permits and its ongoing violations of the Amended 2016 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("Limitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect."); *Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC*, 2016 U.S. Dist. LEXIS 120186, at *12-13, *44 (E.D. Cal. Sept. 6, 2016).

120.    Part I.B. of the Pretreatment Permits establish numeric effluent limits that wastewater discharges from the Facility shall not exceed.

121.    Part I.B.1. of the Pretreatment Permits require that, based on any grab sample of wastewater discharges from the Facility, wastewater discharges from the Facility shall not exceed the following numerical effluent limitations: pH, 6.0 SU min to 9.5 SU max; Dissolved sulfides, 0.5 mg/L; Temperature (except where higher temperatures are required by law), 125ºF (52ºC); and Hydrocarbon oil and grease, 100 mg/L.

122.    Part I.B.2. of the Pretreatment Permits require that, based on grab samples of wastewater discharges from the Facility averaged over a production week, wastewater discharges from the Facility shall not exceed the following numerical effluent limitations: Total recoverable oil and grease, 300 mg/L.

123.    Part I.C.1. of the Pretreatment Permits requires that, based on 24-hour composite sampling of wastewater discharges from the Facility, wastewater discharges from the Facility shall not exceed the following numerical limits: Arsenic, 4.0 mg/L; Cadmium, 0.5 mg/L; Chromium, 5.0 mg/L; Copper, 4.0 mg/L; Lead, 1.5 mg/L; Mercury, 0.05 mg/L; Nickel, 2.0 mg/L; Silver, 0.6 mg/L; and Zinc,

7.0 mg/L.

124.    Part I.C.2. of the Pretreatment Permits requires that, based on any graph sample of wastewater discharges from the Facility, wastewater discharges from the Facility shall not exceed the following numerical limits: Cyanide, 1.0 mg/L; and Phenols, 23.0 mg/L.

125.    Parts I.D. through I.K. of the Pretreatment Permits establish wastewater prohibitions that require the Facility Owner and/or Operator to prevent certain types of wastewater discharges into the POTW.

126.    Part I.E.2. of the Pretreatment Permits prohibit the discharge of pollutants from the Facility into the POTW that will cause corrosive structural damage to the sewerage system, but in no case discharges with pH lower than 5.0 SU.

127.    Part I.G. of the Pretreatment Permits prohibits the Facility Owner and/or Operator from increasing the use of process water or, in any other way, attempting to dilute a discharge of wastewater as partial or complete substitute for adequate treatment to achieve compliance with the requirements of the Pretreatment Ordinance.

128.    Part II of the Pretreatment Permits establishes monitoring requirements the Facility Owner and/or Operator must conduct to determine compliance with the Pretreatment Permits.

129.    Unless the PUC performs the compliance monitoring in lieu of the Facility Owner and/or Operator, Part II.A. of the 2010 Permit, the 2013 Permit, and the 2016 Permit require that the Facility Owner and/or Operator perform self-monitoring at the sampling box located at the northerly entrance to the Facility at least once every six (6) months.

130.    Unless the PUC performs the compliance monitoring in lieu of the Facility Owner and/or Operator, Part II.A. of the 2010 Permit, the 2013 Permit, the 2016 Permit, and the Amended 2016 Permit require that the Facility Owner and/or Operator perform self-monitoring at the Terminal Collection Pit at least once every six (6) months.

131.    Wastewater samples at the Facility are to be collected as one (1) sample per day for five (5) workdays for each listed pollutant, and must be representative of the Facility's wastewater discharges. The pollutants listed in Part II.A. of the 2010 Permit, the 2013 Permit, and the 2016 Permit are as follows: pH, Total recoverable oil and grease, Arsenic, Cadmium, Chromium, Copper, Lead,

Mercury, Nickel, Silver, and Zinc.

132.   The pollutants listed in Part II.A. of the Amended 2016 Permit are as follows: pH, Total recoverable oil and grease, Dissolved Sulfide, Total Suspended Solids, Chemical Oxygen Demand, Arsenic, Cadmium, Chromium, Copper, Lead, Mercury, Nickel, Silver, and Zinc.

133.   The Facility Owner and/or Operator is required to store all hazardous materials and hazardous wastes within a bermed area or by using some other method of secondary containment to prevent spills from entering the combined sewer system. *See* 2010 Permit, Part II.G; 2013 Permit, Part II.H; 2016 Permit, Part II.H; Amended 2016 Permit, Part II.H.

134.   The Facility Owner and/or Operator is required to develop and implement a plan to control slug discharges. *See* 2010 Permit, Part II.I; 2013 Permit, Part II.J; 2016 Permit, Part II.J; Amended 2016 Permit, Part II.J. A slug discharge is any discharge of a non-routine, episodic nature, including but not limited to an accidental spill or non-customary batch discharge which has a reasonable potential to cause interference or pass through, or in any other way violate the Pretreatment Ordinance or the Pretreatment Permits. The slug control plan must contain, at a minimum: (1) a description of discharge practices, including non-routine batch discharges; (2) a description of stored chemicals; (3) procedures for immediately notifying the PUC of slug discharges, including any discharge that would violate a prohibition under 40 C.F.R. § 403.5(b), with procedures for follow-up written notifications within five days; and (4) if necessary, procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and/or measures and equipment for emergency response.

135.   Part III of the Pretreatment Permits establishes reporting requirements. All reports must be signed by an authorized representative of the Facility Owner and/or Operator and must be submitted under penalty of perjury. *See* Pretreatment Permits, Part III.I. Within thirty (30) days of the effective date of the Pretreatment Permits the Facility Owner and/or Operator must: develop and submit (unless previously submitted) to the PUC: (1) a manual (or self-developed set of instructions) on the proper operation and maintenance of any wastewater treatment system used at the Facility; (2) a drawing

showing a flow diagram and the components of the wastewater treatment system; and (3) any required information which has not been submitted in the permittee's wastewater permit application; complete and submit (unless previously submitted) to the PUC a checklist for a Spill Prevention Control and Countermeasures plan, showing facilities and operating procedures to provide protection against spills or accidental discharges of prohibited or regulated materials; and complete and submit (unless previously submitted) to the PUC a checklist for hazardous waste reduction assessment of the Facility. *See* Pretreatment Permits, Part III.A., Part III.B., Part III.C. In addition, Part III.D. of the Pretreatment Permits requires that within thirty (30) days of the effective date of the Pretreatment Permits the Facility Owner and/or Operator complete and submit (unless previously submitted) to the PUC a checklist for a storm water pollution prevention plan for the Facility.

136.    Part III.E. of the Pretreatment Permits requires that the Facility Owner and/or Operator submit semi-annual reports on or before August 1 and February 1 annually. The semi-annual reports must cover the periods January 1 to June 30 and July 1 to December 31, respectively, and must include: (1) average and maximum daily flow rates in gallons per day measured or estimated over the six-month reporting period of the industrial wastewater discharges; (2) copies of all analytical results obtained from any voluntary or required self-monitoring, or from split samples provided by the PUC of its industrial wastewater discharges along with chain-of-custody forms; (3) copies of any uniform hazardous waste manifests and/or other documentation resulting from the shipment off-site of wastes generated in connection with production of wastewater treatment processes at the Facility; (4) a description of any violations of the Pretreatment Ordinance and remedial measures undertaken by the Facility Owner and/or Operator; and (5) a description of any process changes or treatment system alterations.

**E.    Clean Water Act Citizen Suit Provision and Remedies.**

137.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

138.    Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

Complaint                                21

1    139.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act.

2    *See* 33 U.S.C. § 1365(a).

3    140.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to

4    $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA occurring after between January 12,

5    2009 and November 1, 2015, and $51,570 per day per violation for all violations that occurred after

6    November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for

7    Inflation, 40 C.F.R. § 19.4.

8    141.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or

9    substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and

10   consultants' fees.

11   **IV.    FACTUAL BACKGROUND**

12   **A.    Description of Industrial Activities at the Facility.**

13   142.    Plaintiff is informed and believes, and thereon alleges, that industrial activities at the

14   Facility generally include, but are not limited to, the processing plant; meat and bone meal silos and

15   loading area; grease traps wash tanks area; temporary vehicle parking areas; miscellaneous outdoor

16   storage areas; treatment chemicals storage area; raw materials unloading area; cooking oil tank farm;

17   vehicle and equipment maintenance area; vehicle wash area; vehicle fueling area; tallow tank farm area;

18   and the tallow loading and unloading area.

19   143.    The Facility is self-categorized under SIC Code 2077, Animal and Marine Fats and Oils.

20   144.    Facilities that fall under SIC Code 207X are required to analyze storm water samples for

21   the following parameters: TSS, pH, O&G, BOD, COD, and N+N.

22   **B.    Description of the Pretreatment System at the Facility.**

23   145.    Plaintiff is informed and believes, and thereon alleges, that from at least October 2009 to

24   April 2017, the pretreatment system at the "Main Plant" portion of the Facility consisted of a flow

25   equalization basin, a dissolved air flotation, and a contact chamber.

26   146.    Plaintiff is informed and believes, and thereon alleges, that from at least October 2009

27   to February 2017, the wastewater from the "Terminal Collection Pit" portion of the Facility was not

28   subject to pretreatment.

1    147.    Plaintiff is informed and believes, and thereon alleges, that as of April 2017, as described

2    in Defendant's "Wastewater Pretreatment System Operations & Maintenance Manual" the pretreatment

3    system for all wastewater discharges from the Facility consists of: flow equalization basin #1, transfer

4    pump #1, rotary drum screen, transfer pump #2, flow equalization basin #2, dissolved air flotation feed

5    pump, dissolved air flotation system, chemical feed systems, and PLC control system.

6    148.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater

7    Pretreatment System Operations & Maintenance Manual" does not include design calculations for the

8    Facility's pretreatment system.

9    149.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater

10   Pretreatment System Operations & Maintenance Manual" does not include maximum and average

11   design flows.

12   150.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater

13   Pretreatment System Operations & Maintenance Manual" does not identify maximum and average

14   wastewater loadings at the Facility.

15   151.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater

16   Pretreatment System Operations & Maintenance Manual" does not identify how Defendant determined

17   coagulant doses and how coagulant doses will be monitored for effectiveness.

18   152.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater

19   Pretreatment System Operations & Maintenance Manual" does not require Defendant to shut down or

20   reduce production if failure or overloading of the treatment units prevents compliance with the

21   Pretreatment Permits.

22   153.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

23   Operator has failed and continues to fail to implement adequate secondary containment at the Facility.

24   **C.    Defendant's SWPPPs and M&RPs for the Facility.**

25   154.    The SWPPP and M&RP publicly available for the Facility via the SMARTS database is

26   dated January 30, 2017.

27   155.    Plaintiff is informed and believes, and thereon alleges, that the SWPPP and M&RP

28   referenced in paragraph 154 is the current SWPPP and M&RP for the Facility. Plaintiff refers to the

SWPPP and M&RP jointly as the "Facility SWPPP."

**D.     Industrial Activities, Storm Water Pollutant Sources, Storm Water Pollutants, and BMPs at the Facility.**

156.    Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas of industrial activity are pollutant sources at the Facility.

157.    Plaintiff is informed and believes, and thereon alleges, that the SWPPPs for the Facility do not include all areas of industrial activity at the Facility.

158.    Plaintiff is informed and believes, and thereon alleges, that the SWPPPs for the Facility do not adequately describe all industrial processes at the Facility.

159.    Plaintiff is informed and believes, and thereon alleges, that the Facility site map does not include locations and descriptions of structural control measures that affect industrial storm water discharges at the Facility.

160.    Plaintiff is informed and believes, and thereon alleges, that the Facility site map does not identify locations where materials are directly exposed to precipitation at the Facility.

161.    Plaintiff is informed and believes, and thereon alleges, that the Facility site map does not include notes, legends, and other data appropriate to ensure the site map is clear, legible, and understandable.

162.    Plaintiff is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without adequate BMPs to prevent storm water exposure to pollutant sources.

163.    Plaintiff is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without adequate treatment measures to prevent polluted storm water from discharging from the Facility.

164.    Plaintiff is informed and believes, and thereon alleges, that because the Facility SWPPP fails to describe all of the industrial activities, the Facility SWPPP also fails to describe all of the significant materials and processes that are related to the industrial activities at the Facility.

165.    Plaintiff is informed and believes, and thereon alleges, that because all significant materials have not been identified, the Facility SWPPP fails to describe the locations where the materials

1    are stored, received, shipped, and handled, or the typical quantities and frequency of significant

2    materials at the Facility.

3        166.    Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP fails to

4    describe all of the pollutants associated with the industrial activities at the Facility.

5        167.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

6    Operator has failed and continues to fail to adequately assess pollutants associated with potential

7    pollutant sources at the Facility.

8        168.    Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not

9    include an adequate assessment of pollutants associated with potential pollutant sources at the Facility.

10       169.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with

11   industrial activities and areas the Facility include, but are not limited to: sediment, TSS; heavy metals,

12   such as iron, copper, zinc, and aluminum; pH, COD, BOD, N+N, O&G, litter, antifreeze, diesel,

13   transmission and hydraulic oil, motor oil, lubricants, and other pollutants.

14       170.    Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP fails to

15   describe adequate BMPs to reduce or prevent pollutants in the discharges from the Facility.

16       171.    Plaintiff is informed and believes, and thereon alleges, that without properly identifying

17   all industrial activities at the Facility in the Facility SWPPP, the Facility Owner and/or Operator cannot

18   and has not developed all appropriate BMPs.

19       172.    Plaintiff is informed and believes, and thereon alleges, that without properly identifying

20   all industrial activities at the Facility in the Facility SWPPP, the Facility Owner and/or Operator cannot

21   and has not implemented all appropriate BMPs.

22       173.    Plaintiff is informed and believes, and thereon alleges, that without properly identifying

23   all significant materials at the Facility in the Facility SWPPP, the Facility Owner and/or Operator cannot

24   and has not developed all appropriate BMPs.

25       174.    Plaintiff is informed and believes, and thereon alleges, that without properly identifying

26   all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has

27   not implemented all appropriate BMPs.

28       175.    Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not

1   include an adequate assessment of potential pollutant sources at the Facility.

2   176.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

3   Operator has failed and continues to fail to assess the BMPs at the Facility corresponding to potential

4   pollutant sources and associated pollutants.

5   177.   Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not

6   include an adequate assessment of the BMPs at the Facility corresponding to potential pollutant sources

7   and associated pollutants.

8   178.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

9   Operator has failed and continues to fail to assess potential pollutant sources at the Facility.

10   179.   Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not

11   include an adequate description of the BMPs at the Facility.

12   180.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

13   Operator has failed and continues to fail to analyze the effectiveness of the BMPs at the Facility.

14   181.   Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not

15   include an adequate analysis of the effectiveness of the BMPs at the Facility.

16   182.   Plaintiff is informed and believes, and thereon alleges, that storm water sampling at the

17   Facility demonstrates that the storm water discharges from the Facility contain concentrations of

18   pollutants above EPA Benchmarks, including, but not limited to: aluminum, iron, pH, N+N, BOD,

19   COD, TSS, and zinc.

20   183.   Defendant's self-reported data for its storm water sample collected December 8, 2016,

21   indicates exceedances of Benchmarks, NALs, and/or applicable Water Quality Standards for the

22   following parameters: N+N, O&G, BOD, COD, and TSS.

23   184.   Defendant's self-reported data for its storm water sample collected December 15, 2016,

24   indicates exceedances of Benchmarks, NALs, and/or applicable Water Quality Standards for the

25   following parameters: O&G, BOD, COD, and TSS.

26   185.   Defendant's self-reported data for its storm water sample collected March 20, 2017,

27   indicates exceedances of Benchmarks, NALs, and/or applicable Water Quality Standards for the

28   following parameters: O&G, BOD, COD, and TSS.

1  186. Defendant's self-reported data for its storm water sample collected March 24, 2017,

2 indicates exceedances of Benchmarks, NALs, and/or applicable Water Quality Standards for the

3 following parameters: O&G, BOD, COD, and TSS.

4  187. Plaintiff is informed and believes, and thereon alleges, that the ongoing, repeated and

5 significant exceedances of EPA Benchmarks demonstrate that the Facility Owner and/or Operator failed

6 and continues to fail to develop BMPs to prevent the exposure of pollutants to storm water, and to

7 prevent discharges of polluted storm water from the Facility.

8  188. Plaintiff is informed and believes, and thereon alleges, that the ongoing, repeated and

9 significant exceedances of EPA Benchmarks demonstrate that the Facility Owner and/or Operator failed

10 and continues to fail to implement BMPs to prevent the exposure of pollutants to storm water, and to

11 prevent discharges of polluted storm water from the Facility.

12  189. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

13 Operator has failed and continues to fail to adequately revise the Facility SWPPP.

14  **E.** **Storm Water and Wastewater Discharge Locations at the Facility.**

15  190. Plaintiff is informed and believes, and thereon alleges, that storm water in the central part

16 of the Facility is collected, treated in the on-site wastewater treatment system, and discharged to the City

17 of San Francisco's combined sewer system.

18  191. Plaintiff is informed and believes, and thereon alleges, that storm water in the western

19 part of the Facility flows directly to the City of San Francisco's combined sewer system.

20  192. Plaintiff is informed and believes, and thereon alleges, that storm water in the northeast

21 corner of the Facility flows to two (2) storm water inlets at Amador Street, which discharge to an outfall

22 at Islais Creek Channel, approximately 500 feet northwest of the Facility.

23  193. Plaintiff is informed and believes, and thereon alleges, that storm water from a localized

24 area in the southwestern part of the Facility enters a storm drain inlet and discharges directly to Islais

25 Creek.

26  194. Plaintiff is informed and believes, and thereon alleges, that wastewater from the Facility

27 is discharged into the combined sanitary sewer at the side sewers on Amador Street.

28  195. Plaintiff is informed and believes, and thereon alleges, that between October 2009 and

February 2017, storm water could and/or did commingle with the Facility's wastewater before the mixed discharges entered the pretreatment system at the Facility.

196.    Plaintiff is informed and believes, and thereon alleges, that after February 2017, storm water can and/or does commingle with the Facility's wastewater before the mixed discharges enter the pretreatment system at the Facility.

197.    Plaintiff is informed and believes, and thereon alleges, that a "Darling Wastewater Flowchart" dated April 2016 did not indicate whether wastewater and storm water that entered the terminal collection pit is subject to pretreatment prior to discharging to the sanitary sewer.

198.    Plaintiff is informed and believes, and thereon alleges, that the average wastewater discharges in 2016 were 70,000 gallons per day.

199.    Plaintiff is informed and believes, and thereon alleges, that from at least October 2009 to February 2017 wastewater discharged, and/or could discharge, from the Facility from the "Main Plant" and the "Terminal Pit."

200.    Plaintiff is informed and believes, and thereon alleges, that beginning February 2017 wastewater discharges from the Facility from the "Terminal Pit" only.

**F.    Defendant's Storm Water Sampling, Monitoring, and Reporting.**

201.    The Facility SWPPP includes the "Storm Water Monitoring Implementation Plan ("MIP")" for the Facility.

202.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to conduct all required quarterly and/or monthly visual observations of unauthorized discharges at the Facility.

203.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed to conduct, and/or provide the records required by the Storm Water Permit for, monthly visual observations of storm water discharges at the Facility.

204.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator fail to consistently analyze storm water discharges from the Facility for BOD, COD, and N+N.

205.    Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP fails to require that the Facility Owner and/or Operator analyze storm water discharges from the Facility for all

required parameters by failing to specify that storm water discharges will be analyzed for, at a minimum, aluminum, copper, iron, and zinc.

206.   Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP fails to require the Facility Owner and/or Operator collect storm water samples from all discharge locations at the Facility from all storm water discharges occurring during QSEs.

207.   Defendant has submitted Annual Reports to the Regional Board for the 2011-2012, 2012-2013, 2013-2014, 2014-2015, and 2015-2016 reporting years. In each Annual Report, Defendant certified its full compliance with the Storm Water Permit.

2011-2012 Annual Report

208.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which drainage areas were observed in the 2011-2012 Annual Report for the Facility.

209.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2011-2012 Annual Report for the Facility.

210.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2011-2012 Annual Report for the Facility.

211.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2011-2012 Annual Report for the Facility.

212.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2011-2012 Annual Report for the Facility.

213.   Plaintiff is informed and believes, and thereon alleges, that per the applicable group

monitoring plan during the 2011-2012 reporting year, and as reported in the 2011-2012 Annual Report, the Facility Owner and/or Operator was required to collect at least one (1) storm water sample at the Facility.

214.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility storm water discharges in significant quantities, such as COD, BOD, and N+N, during the 2011-2012 reporting year.

215.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2011-2012 Annual Report.

216.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2011-2012 Annual Report was false because it failed to comply with each of the requirements of Section B(14) of the 1997 Permit.

217.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2011-2012 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

218.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2011-2012 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

219.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance at the Facility with the Storm Water Permit in its 2011-2012 Annual Report.

220.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2011-2012 Annual Report for the Facility.

///

1

2012-2013 Annual Report

2          221.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

3    Operator failed to indicate the location of non-storm water visual observations to document which

4    drainage areas were observed in the 2012-2013 Annual Report for the Facility.

5          222.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

6    Operator failed to include the required evaluation of its quarterly visual observations of unauthorized

7    non-storm water discharges for each of its drainage areas in the 2012-2013 Annual Report for the

8    Facility.

9          223.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

10   Operator failed to include the required summary of its monthly visual observations of storm water

11   discharges for each of its discharge points in the 2012-2013 Annual Report for the Facility.

12         224.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

13   Operator failed to include the required evaluation of its monthly visual observations of storm water

14   discharges for each of its discharge points in the 2012-2013 Annual Report for the Facility.

15         225.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

16   Operator failed to include the required summary of the presence of any floating and suspended material,

17   O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the

18   2012-2013 Annual Report for the Facility.

19         226.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

20   Operator failed to include the required evaluation of the presence of any floating and suspended

21   material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points

22   in the 2012-2013 Annual Report.

23         227.   Plaintiff is informed and believes, and thereon alleges, that during the 2012-2013

24   reporting year the Facility Owner and/or Operator failed to collect any storm water samples at the

25   Facility, despite the occurrence of at least one (1) qualifying rain event in the 2012-2013 reporting year.

26         228.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

27   Operator did not report any storm water samples in its 2012-2013 Annual Report for the Facility, despite

28   the occurrence of at least one (1) qualifying rain event at the Facility in 2012-2013 reporting year.

Complaint                                         31

229.     Plaintiff is informed and believes, and thereon alleges, that per the applicable group monitoring plan during the 2012-2013 reporting year, and as reported in the 2012-2013 Annual Report, the Facility Owner and/or Operator was required to collect at least one (1) storm water sample at the Facility.

230.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2012-2013 Annual Report.

231.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2012-2013 Annual Report for the Facility was false because it failed to comply with each of the requirements of Section B(14) of the 1997 Permit.

232.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2012-2013 Annual Report for the Facility was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

233.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2012-2013 Annual Report for the Facility was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

234.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance at the Facility with the Storm Water Permit in its 2012-2013 Annual Report.

235.     Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2012-2013 Annual Report for the Facility.

2013-2014 Annual Report

236.     Plaintiff is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2013-2014 Annual Report.

237.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2013-2014 Annual Report.

238.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which drainage areas were observed in the 2013-2014 Annual Report.

239.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2013-2014 Annual Report.

240.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2013-2014 Annual Report.

241.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2013-2014 Annual Report.

242.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2013-2014 Annual Report.

243.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2013-2014 Annual Report.

244.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2013-2014 Annual Report.

245.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

Operator's certification of compliance in the 2013-2014 Annual Report for the Facility was false because it failed to comply with each of the requirements of Section B(14) of the 1997 Permit.

246.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2013-2014 Annual Report for the Facility was false because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

247.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2013-2014 Annual Report for the Facility was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

248.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of the Facility noncompliance with the Storm Water Permit in its 2013-2014 Annual Report.

249.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2013-2014 Annual Report.

2014-2015 Annual Report

250.    Plaintiff is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2014-2015 Annual Report.

251.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2014-2015 Annual Report.

252.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which drainage areas were observed in the 2014-2015 Annual Report.

253.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water

1   discharges for each of its discharge points in the 2014-2015 Annual Report.

2   254.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

3   Operator failed to include the required evaluation of its monthly visual observations of storm water

4   discharges for each of its discharge points in the 2014-2015 Annual Report.

5   255.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

6   Operator failed to include the required summary of the presence of any floating and suspended material,

7   O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2014-

8   2015 Annual Report.

9   256.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

10  Operator failed to include the required summary of the presence of any floating and suspended material,

11  O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the

12  2014-2015 Annual Report.

13  257.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

14  Operator failed to include the required evaluation of the presence of any floating and suspended

15  material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in

16  the 2014-2015 Annual Report.

17  258.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

18  Operator failed to include the required evaluation of the presence of any floating and suspended

19  material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points

20  in the 2014-2015 Annual Report.

21  259.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

22  Operator certified that the Facility was in compliance with the Storm Water Permit in its 2014-2015

23  Annual Report.

24  260.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

25  Operator's certification of compliance in the 2014-2015 Annual Report was false because it failed to

26  comply with each of the requirements of Section B(14) of the 1997 Permit.

27  261.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

28  Operator's certification of compliance in the 2014-2015 Annual Report for the Facility was false

Complaint                                           35

1   because the Facility Owner and/or Operator had not revised the Facility SWPPP to achieve compliance

2   with the Storm Water Permit.

3       262.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

4   Operator's certification of compliance in the 2014-2015 Annual Report was false because the Facility

5   Owner and/or Operator had not revised the Facility M&RPs to achieve compliance with the Storm

6   Water Permit.

7       263.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

8   Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its

9   2014-2015 Annual Report.

10       264.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

11   Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with

12   the Storm Water Permit in its 2014-2015 Annual Report.

13       <u>2015-2016 Annual Report</u>

14       265.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

15   Operator failed to analyze all storm water samples collected for all required parameters, including

16   pollutants likely to be present in the Facility storm water discharges in significant quantities, such as

17   aluminum, iron, copper, and zinc, during the 2015-2016 reporting year.

18       266.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

19   Operator certified that the Facility was in compliance with the Storm Water Permit in its 2015-2016

20   Annual Report.

21       267.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

22   Operator's certification of compliance in the 2015-2016 Annual Report was false because it failed to

23   comply with each of the requirements of Section XI of the 2015 Permit.

24       268.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

25   Operator's certification of compliance in the 2015-2016 Annual Report was false because the Facility

26   Owner and/or Operator had not revised the Facility SWPPP to achieve compliance with the Storm Water

27   Permit.

28       269.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2015-2016 Annual Report.

270.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2015-2016 Annual Report.

2016-2017 Reporting Year

271.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility storm water discharges in significant quantities such as aluminum, iron, copper, and zinc, during the 2016-2017 reporting year.

**G.    Defendant's Level 1 Exceedance Response Action Report.**

272.    Based on Defendant's self-reported data from storm water samples collected during the 2015-2016 reporting year, as of July 1, 2016, Defendant is in Level 1 status for BOD, COD, and N+N.

273.    The annual average for BOD during the 2015-2016 reporting year was 56.76 mg/L, 1.89 times the NAL; the annual average for COD during the 2015-2016 reporting year was 127.5 mg/L, 1.06 times the NAL; and the annual average for N+N during the 2015-2016 reporting year was 1.0838 mg/L, 1.59 times the NAL.

274.    Defendant's Level 1 status evaluation and Level 1 ERA Report, prepared in December 2016, identified five additional/improved BMPs to be implemented at the Facility in Table 2-3.

275.    Two out of five of the BMPs identified in Defendant's Level 1 ERA Report were scheduled for implementation by October 31, 2016 (cleaning storm water drainage areas more frequently or more effectively; and relocating parked trucks).

276.    The remaining three BMPs identified in Defendant's Level 1 ERA Report were scheduled for implementation by December 31, 2016 (BMP training for non-employees; washing truck wheels; and cleaning equipment prior to storage).

277.    Plaintiff is informed and believes, and thereon alleges, that Defendant's Level 1 status evaluation and Level 1 ERA Report only recommended improvements to minimum BMPs, and did not recommend advanced BMPs for the Facility's drainage areas which discharge storm water to Islais

Creek.

278.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility have contained concentrations of pollutants above EPA Benchmarks, NALs, and/or WQS after December 31, 2016, including but not limited to in discharges from the Facility on March 20, 2017, and March 24, 2017.

**H.    Defendant's Wastewater Sampling, Monitoring, and Reporting.**

279.    Plaintiff is informed and believes, and thereon alleges, that from at least October 2009 to April 2017 Defendant did not collect samples from wastewater discharges from the Facility, with the exception of samples Defendant collected in November 2013.

280.    Plaintiff is informed and believes, and thereon alleges, that Defendant's "Wastewater Pretreatment System Operations & Maintenance Manual" includes a section titled "Laboratory Controls" the purpose of which is described as, among other things, to "satisfy the discharge permit report requirements" and "enforce the Federal Clean Water Act."

281.    Plaintiff is informed and believes, and thereon alleges, that the PUC has collected samples from the Facility's wastewater discharges to determine the sewer service charge rate for the Facility's water account.

282.    Plaintiff is informed and believes, and thereon alleges, that the PUC did not collect samples of wastewater discharges in lieu of the Facility Owner and/or Operator, and the Facility Owner and/or Operator failed to collect any samples from the sampling box at least once every six (6) months and failed to analyze samples for all pollutants regulated by the Pretreatment Permits for at least the past five (5) years.

283.    Plaintiff is informed and believes, and thereon alleges, that the PUC did not collect samples of wastewater discharges in lieu of the Facility Owner and/or Operator, and the Facility Owner and/or Operator failed to collect any samples from the Terminal Collection Pit at least once every six (6) months and failed to analyze samples for all pollutants regulated by the Pretreatment Permits for at least the past five (5) years.

284.    Plaintiff is informed and believes, and thereon alleges, that samples collected by the PUC that have been analyzed for total O&G for the past five (5) years have been collected only from the

1   sampling box with one, or possibly two, exceptions.

2        285.   Plaintiff is informed and believes, and thereon alleges, that the sampling conducted by

3   the PUC did not, and does not, satisfy the Pretreatment Ordinance monitoring requirements, because the

4   PUC did not analyze the collected samples for all parameters for which the Pretreatment Ordinance and

5   the Pretreatment Permits establish wastewater effluent limitations.

6        286.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

7   Operator has failed, and continues to fail, to conduct required self-monitoring for the following

8   pollutants: (1) temperature; (2) hydrocarbon oil and grease; (3) cyanide; and (4) phenols.

9        287.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

10  Operator has failed and continues to fail to develop and implement an adequate plan to control slug

11  discharges at the Facility.

12       288.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

13  Operator has failed and continues to fail to develop, complete, and submit the reports required by Parts

14  III.A., III.B., III.C., and III.D. of the Pretreatment Permits.

15       289.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

16  Operator has failed and continues to fail to submit complete and correct semi-annual reports.

17       290.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

18  Operator's semi-annual reports for 2012, 2013, 2015, and 2016 report that "No Notice of Violation has

19  been received." The Facility Owner and/or Operator was in violation of the Pretreatment Ordinance in

20  2012, 2013, 2015, and 2016, e.g., the Facility Owner and/or Operator failed to collect required samples

21  and its wastewater discharges exceeded wastewater effluent limitations and prohibitions. The Facility

22  Owner and/or Operator failed to report these violations.

23       291.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

24  Operator's semi-annual report dated July 25, 2016, fails to include a description of process changes or

25  treatment system alteration, but simply states, "We implemented process and equipment changes as

26  described in the above referenced response to notice of violation" dated February 8, 2016. The

27  referenced February 8 "response" was not included as an attachment to the semi-annual report and was

28  not submitted under penalty of perjury.

292.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator was in "significant non-compliance" with the Pretreatment Permits in 2012, 2014, and 2016.

293.    Plaintiff is informed and believes, and thereon alleges, that based on pollutant levels in wastewater discharges from the Facility, on November 1, 2013, the PUC issued a Cease and Desist Order requiring the Facility Owner and/or Operator to take certain remedial actions.

294.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator did not satisfy the requirements of the November 1, 2013, Cease and Desist Order.

295.    Plaintiff is informed and believes, and thereon alleges, that based on pollutant levels in wastewater discharges from the Facility, on November 19, 2010, June 15, 2011, and January 22, 2016, the PUC issued the Facility Owner and/or Operator Notices of Violation.

296.    Plaintiff is informed and believes, and thereon alleges, that on four (4) occasions Defendant discharged wastewater into the POTW with a pH lower than 5.0 SU.

297.    Plaintiff is informed and believes, and thereon alleges, that Facility Owner and/or Operator may have diluted wastewater discharges with storm water at the Terminal Collection Pit as a partial or complete substitute for adequate treatment to achieve compliance with the requirements of the Pretreatment Ordinance.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the
Storm Water Permit Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

298.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

299.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

300.    Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the

Facility occur every time storm water discharges from the Facility.

301.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

302.    The Facility Owner and/or Operator violates and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

303.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

304.    Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

305.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

306.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

307.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

### Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

308.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

set forth herein.

309.    Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

310.    Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of WQS has discharged and continues to discharge each time storm water discharges from the Facility.

311.    The Facility Owner and/or Operator violates and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

312.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

313.    Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

314.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

315.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

316.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

///

1

**THIRD CAUSE OF ACTION**

2

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a
Storm Water Pollution Prevention Plan in Violation of the Storm Water
Permit and the Clean Water Act.**

3

4

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

5

6       317.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

7    set forth herein.

8       318.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

9    Operator has failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of

10   the Storm Water Permit.

11      319.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

12   Operator has failed and continues to fail to adequately implement the SWPPP for the Facility, in

13   violation of the Storm Water Permit.

14      320.    Plaintiff is informed and believes, and thereon alleges, that Facility Owner and/or

15   Operator has failed and continues to fail to adequately revise the SWPPP for the Facility, in violation of

16   the Storm Water Permit.

17      321.    The Facility Owner and/or Operator has been in violation of the Storm Water Permit at

18   the Facility every day from May 8, 2012, to the present.

19      322.    The Facility Owner and/or Operator's violations of the Storm Water Permit and the CWA

20   at the Facility are ongoing and continuous.

21      323.    The Facility Owner and/or Operator will continue to be in violation of the Storm Water

22   Permit and the CWA each and every day the Facility Owner and/or Operator fails to adequately develop,

23   implement, and/or revise the SWPPP for the Facility.

24      324.    Each and every violation of the Storm Water Permit SWPPP requirements at the Facility

25   is a separate and distinct violation of the CWA.

26      325.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator

27   is subject to an assessment of civil penalties for each and every violation of the CWA occurring from

28   May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d),

1   1365, and 40 C.F.R. § 19.4.

2   326.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

3   CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

4   irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no

5   plain, speedy, or adequate remedy at law.

6   327.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

7   controversy exists as to the rights and other legal relations of the Parties.

8   WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

9   **FOURTH CAUSE OF ACTION**

10  **Defendant's Failure to Adequately Develop, Implement, and/or Revise a**
    **Monitoring and Reporting Plan in Violation of the Storm Water Permit and**
11  **the Clean Water Act.**

12  **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

13  328.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

14  set forth herein.

15  329.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

16  Operator has failed and continues to fail to develop an adequate M&RP for the Facility, in violation of

17  the Storm Water Permit.

18  330.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

19  Operator has failed and continues to fail to adequately implement the M&RP for the Facility, in

20  violation of the Storm Water Permit.

21  331.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

22  Operator has failed and continues to fail to adequately revise the M&RP for the Facility, in violation of

23  the Storm Water Permit.

24  332.    The Facility Owner and/or Operator has been in violation of the Storm Water Permit

25  monitoring requirements at the Facility every day from May 8, 2012, to the present.

26  333.    The Facility Owner and/or Operator's violations of the Storm Water Permit monitoring

27  requirements and the CWA at the Facility are ongoing and continuous.

28  334.    The Facility Owner and/or Operator will continue to be in violation of Section B and

Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day it fails to adequately develop, implement, and/or revise the M&RP for the Facility.

335.   Each and every violation of the Storm Water Permit M&RP requirements at the Facility is a separate and distinct violation of the CWA.

336.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

337.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

338.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

339.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

340.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

341.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's 2011-2012, 2012-2013, 2013-2014, and 2014-2015 Annual Reports failed to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

342.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's 2015-2016 Annual Reports fail to meet the requirements of Section XVI(B) of the 2015 Permit.

343.    The Facility Owner and/or Operator has been in violation of Section B(14) of the 1997 Permit and the CWA every day since at least May 8, 2012.

344.    The Facility Owner and/or Operator has been in violation of Section XVI of the 2015 Permit and the CWA every day since at least July 15, 2016.

345.    The Facility Owner and/or Operator's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

346.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

347.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

348.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Defendant's Failure to Submit an Adequate Level 1 ERA Report in Violation
of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

349.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

350.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to conduct a Level 1 status evaluation and submit a Level 1

1   ERA Report for the Facility.

2        351.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or

3   Operator has conducted an inadequate Level 1 status evaluation and submitted an inadequate Level 1

4   ERA Report.

5        352.    The Facility Owner and/or Operator violations of the Level 1 ERA requirements of the

6   Storm Water Permit and the CWA are ongoing and continuous.

7        353.    Every day the Facility Owner and/or Operator conducts operations at the Facility without

8   a Level 1 status evaluation and/or a Level 1 ERA Report, and/or an adequate Level 1 status evaluation

9   and/or an adequate Level 1 ERA Report, is a separate and distinct violation of the Storm Water Permit

10  and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

11       354.    The Facility Owner and/or Operator has been in daily and continuous violation of the

12  Storm Water Permit Level 1 status ERA requirements every day since at least July 1, 2016.

13       355.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator

14  is subject to an assessment of civil penalties for each and every violation of the CWA occurring from

15  July 1, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d),

16  1365, and 40 C.F.R. § 19.4.

17       356.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

18  CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

19  irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no

20  plain, speedy, or adequate remedy at law.

21       357.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

22  controversy exists as to the rights and other legal relations of the Parties.

23       WHEREFORE, Plaintiff pray judgment against the Defendant as set forth hereafter.

24                          **SEVENTH CAUSE OF ACTION**

25    **Defendant's Numeric Effluent Limitations Exceedances in Violation of the
      Pretreatment Permits, the Pretreatment Ordinance, and the Clean Water Act.**

26    **33 U.S.C. §§ 1311, 1317, 1342, 1365(a) and 1365(f)**

27

28       358.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

Complaint                                47

set forth herein.

359.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners and/or Operator has exceeded the numeric effluent limitations established by the Pretreatment Permits on at least 47 occasions on 18 days as follows:

| Sample Date | Pollutant Parameter | Result | Unit |
|---|---|---|---|
| 11/14/12 | Dissolved Sulfides | 0.72 | mg/L |
| 11/15/12 | Dissolved Sulfides | 0.7 | mg/L |
| 11/28/12 | Dissolved Sulfides | 0.52 | mg/L |
| 8/30/13-9/12/13 | Average Total Recoverable Oil and Grease | 509.2 | mg/L |
| 8/30/13-9/17/13 | Average Total Recoverable Oil and Grease | 4239 | mg/L |
| 9/12/13 | pH | 4.41 | SU |
| 11/19/13 | pH | 5.4 | SU |
| 11/21/13 | pH | 4.3 | SU |
| 11/21/13 | pH | 4.3 | SU |
| 11/22/13 | pH | 4.7 | SU |
| 11/22/13 | pH | 4.7 | SU |
| 4/22/15 | Average Total Recoverable Oil and Grease | 1056.8 | mg/L |
| 4/29/15 | Dissolved Sulfides | 0.54 | mg/L |
| 12/15/15 | Copper Total | 6.43 | mg/L |
| 12/15/15 | pH | 5.2 | SU |
| 6/2/16-6/10/16 | Average Total Recoverable Oil and Grease | 470.8 | mg/L |

| Sample Date | Pollutant Parameter | Result | Unit |
|---|---|---|---|
| 10/12/16-10/21/16 | Average Total Recoverable Oil and Grease | 1608 | mg/L |
| 10/12/16-10/21/16 | Average Total Recoverable Oil and Grease | 1037 | mg/L |

360.    The Facility Owner and/or Operator's violations of the numeric effluent limitations of the Pretreatment Permits and the CWA are ongoing and/or are intermittent and likely to be repeated.

361.    Every day the Facility Owner and/or Operator discharges wastewater from the Facility into the sanitary sewer in excess of the numeric effluent limitations of the Pretreatment Permits is a separate and distinct violation of the Pretreatment Permits, the Pretreatment Ordinance, and Sections 301 and 307 of the CWA, 33 U.S.C. §§ 1311, 1317.

362.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

363.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

364.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff pray judgment against the Defendant as set forth hereafter.

## EIGHTH CAUSE OF ACTION

**Defendant's Discharge of Prohibited Wastewater in Violation of the Pretreatment Permits, the Pretreatment Ordinance, and the Clean Water Act.**

**33 U.S.C. §§ 1311, 1317, 1342, 1365(a) and 1365(f)**

365.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

366.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Part I.E.2. of the Pretreatment Permits by discharging wastewater from the Facility to the POTW with pH lower than 5.0 SU on 4 occasions over 4 days as follows:

| Sample Date | Pollutant Parameter | Result | Unit |
|---|---|---|---|
| 11/21/13 | pH | 4.3 | SU |
| 11/21/13 | pH | 4.3 | SU |
| 11/22/13 | pH | 4.7 | SU |
| 11/22/13 | pH | 4.7 | SU |

367.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Part I.G. of the Pretreatment Permits by diluting wastewater discharges with storm water at the Terminal Collection Pit as a partial or complete substitute for adequate treatment to achieve compliance with the requirements of the Pretreatment Ordinance.

368.    The Facility Owner and/or Operator's violations of the wastewater prohibitions of the Pretreatment Permits and the CWA are ongoing and/or are intermittent and likely to be repeated.

369.    Every day the Facility Owner and/or Operator discharges wastewater from the Facility into the sanitary sewer in violation of the wastewater prohibitions of the Pretreatment Permits is a separate and distinct violation of the Pretreatment Permits, the Pretreatment Ordinance, and Sections 301 and 307 of the CWA, 33 U.S.C. §§ 1311, 1317.

370.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

371.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

372.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

1   controversy exists as to the rights and other legal relations of the Parties.

2        WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

3                              **NINTH CAUSE OF ACTION**

4   **Defendant's Failure to Monitor as Required by the Pretreatment Permits, the
    Pretreatment Ordinance, and the Clean Water Act.**

5        **33 U.S.C. §§ 1311, 1317, 1342, 1365(a) and 1365(f)**

6

7        373.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

8   set forth herein.

9        374.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Part II of

10  the Pretreatment Permits by failing to monitor wastewater discharges from the Facility as required.

11       375.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Sections

12  123(a), 123(b), and 123(c) of the Pretreatment Ordinance by failing to monitor its wastewater discharges

13  as required.

14       376.    The Facility Owner and/or Operator's violations of Part II of the Pretreatment Permits,

15  the Pretreatment Ordinance, and the CWA are ongoing and/or are intermittent and likely to be repeated.

16       377.    Every day the Facility Owner and/or Operator fails to comply with Part II of the

17  Pretreatment Permits is a separate and distinct violation of the Pretreatment Permits, the Pretreatment

18  Ordinance, and Sections 301 and 307 of the Clean Water Act, 33 U.S.C. §§ 1311, 1317.

19       378.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator

20  is subject to an assessment of civil penalties for each and every violation of the CWA occurring from

21  May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d),

22  1365, and 40 C.F.R. § 19.4.

23       379.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

24  CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

25  irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no

26  plain, speedy, or adequate remedy at law.

27       380.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

28  controversy exists as to the rights and other legal relations of the Parties.

Complaint                              51

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## TENTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the Pretreatment Permits, the Pretreatment Ordinance, and the Clean Water Act.**

**33 U.S.C. §§ 1311, 1317, 1342, 1365(a) and 1365(f)**

381.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

382.     Plaintiff is informed and believes, and thereon alleges, that Defendant violated Part III of the Pretreatment Permits by failing to report to the PUC as required.

383.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Sections 125(a) and 125(b) of the Pretreatment Ordinance by failing to submit adequate applications to the PUC in support of the 2010, 2013, and 2016 Permits.

384.    Plaintiff is informed and believes, and thereon alleges, that Defendant violated Sections 125(a) and 125(b) of the Pretreatment Ordinance by failing to submit an application in support of the Amended 2016 Permit.

385.    The Facility Owner and/or Operator's violations of Part III of the Pretreatment Permits, Pretreatment Ordinance, and the CWA are ongoing and/or are intermittent and likely to be repeated.

386.    Every day the Facility Owner and/or Operator fails to comply with Part III of the Pretreatment Permits is a separate and distinct violation of the Pretreatment Permits, the Pretreatment Ordinance, and Sections 301 and 307 of the Clean Water Act, 33 U.S.C. §§ 1311, 1317.

387.    By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 8, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

388.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

389.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

**VI.      RELIEF REQUESTED**

390.     Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the CWA, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.      A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a), 301(b), and 307 of the CWA, 33 U.S.C. §§ 1311(a), 1311(b), 1317, for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations, and for failing to comply with the substantive and procedural requirements of the Pretreatment Permits and the Pretreatment Ordinance;

c.      A Court order enjoining Defendant from discharging pollutants in a manner inconsistent with an NPDES permit;

d.      A Court order enjoining Defendant from discharging pollutants in a manner inconsistent with the Pretreatment Ordinance;

e.      A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit, the Pretreatment Permits, the Pretreatment Ordinance, and the CWA;

f.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations between January 12, 2009 and November 1, 2015, and $51,570.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

1    g.    A Court order awarding Plaintiff their reasonable costs of suit, including attorney,

2    witness, expert, and consultant fees, as permitted by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

3    and

4    h.    Any other relief as this Court may deem appropriate.

5

6    Dated: May 8, 2017                                    Respectfully submitted,

7                                                          LAWYERS FOR CLEAN WATER, INC.

8                                                          _Caroline Koch_

9                                                          Caroline Koch
                                                           Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                    54